{¶ 15} I must respectfully dissent from the majority opinion in this case. The evidence in this case does not support the verdict. The trial court should have sustained Appellant's motion for directed verdict and motion for judgment notwithstanding the verdict ("JNOV").
 {¶ 16} The standards of review of a decision whether to grant directed verdict or a motion for judgment notwithstanding the verdict are virtually the same. We review de novo a trial court's ruling on both of these requests because they present us with a question of law. Schafer v. RMS Realty (2000),138 Ohio App.3d 244,257,741 N.E.2d 155. When considering either of these two types of motions, a court must construe the evidence most strongly in favor of the party against whom the motion is directed. Strother v. Hutchinson (1981), 67 Ohio St.2d 282,284, 21 O.O.3d 177, 423 N.E.2d 467. Where there is substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, the court should overrule the motion. Ramage v. Cent. Ohio EmergencyServ., Inc. (1992), 64 Ohio St.3d 97, 109, 592 N.E.2d 828.
 {¶ 17} At issue in the trial of this case was the amount of underinsured motorist damages Appellees were entitled to receive. This amount was based on the extent of the injuries they received that could be attributed to the automobile accident. There was no question that Mrs. Antonoff had been rear-ended by a pizza delivery car, and no question that the driver of that vehicle was negligent in driving his car into Mrs. Antonoff's car. The case against the negligent driver was settled before Appellees filed a complaint against Appellant; their own automobile insurance carrier. The instant case required the jury to determine the reasonable amount of damages attributable to the accident and not covered by the prior settlement with the negligent driver's insurance company.
 {¶ 18} As the trial in this case was ready to begin, the trial judge asked Appellees' counsel if he had any evidence of the causal connection between the automobile accident and the damages that Appellees asserted. The following exchange between the judge and the attorney is helpful:
 {¶ 19} "THE COURT: Don't you need a causal connection to get to damages? Isn't that what Mr. Reid [Appellant's counsel] is talking about, that you have to prove some causal connection between this condition that you are claiming and all of the damages that the Antonoffs are claiming?
 {¶ 20} "MR. ESSAD: The problem that the Antonoffs have in this case, in `93 when the accident occurred she was treated by a fellow named by — a doctor name Fogarty. Dr. Fogarty has since retired and is unavailable. She started treating in 1996 after the accident with Dr. Cubbison. That was her family doctor most recently, and that's the only one who was available to us. So, of course, he was not treating her.
 {¶ 21} "THE COURT: Then he is the one that doesn't relate the condition to the accident?
 {¶ 22} "MR. ESSAD: No, he doesn't say that. He says that I wasn't treating her in 1993, so I really can't say. * * *
 {¶ 23} "THE COURT: Well, how about it I let you have everybody you want to testify about that but there is no causal connection? I can't let it go to the jury.
 {¶ 24} "MR. ESSAD: Well, then Mr. Reid will win on a directed verdict motion, clearly. * * *" (Tr., pp. 22-24.)
 {¶ 25} Appellees' counsel was keenly aware of the problem he had in proving proximate cause in this case. Appellees did try to provide expert testimony to at least partially prove that the accident caused Mrs. Antonoff's depression and caused a knee injury. Appellees attempted to prove these causal connections through the videotaped testimony of Dr. Cubbison. Appellant has challenged the relevance, usefulness and admissibility of that expert witness testimony. Appellees barely address Appellant's second assignment of error discussing Dr. Cubbison's failure to provide any reliable evidence of causation. Dr. Cubbison only testified as to a possible causal connection rather than a probable causal connection. Appellant correctly argues that expert testimony cannot establish causation unless it is based on probabilities, and not on mere possibilities:
 {¶ 26} "It is well-settled that the establishment of proximate cause through medical expert testimony must be by probability. At a minimum, the trier of fact must be provided with evidence that the injury was more likely than not caused by defendant's negligence. * * * Opinions expressed with a lesser degree of certainty must be excluded as speculative." Shumakerv. Oliver B. Cannon Sons, Inc. (1986), 28 Ohio St.3d 367, 369,504 N.E.2d 44. "Testimony suggesting the mere possibility of a causal connection between an accident and an injury is not sufficient." Leaman v. Coles (1996), 115 Ohio App.3d 627, 630,685 N.E.2d 1294. See also Stinson v. England (1994),69 Ohio St.3d 451, 455, 633 N.E.2d 532.
 {¶ 27} Dr. Cubbison did not state his opinion in the form of a reasonable probability, and therefore, it had no evidentiary value in establishing any causal connection between the automobile accident and the damages asserted by Appellees. It does not appear that the majority disagrees with this conclusion.
 {¶ 28} Appellees' alternative to expert testimony is the lay witness testimony of Mr. and Mrs. Antonoff. Appellees argue that expert evidence was not required in this case because the victims, even though they were lay witnesses, were qualified to testify about their own injuries. Appellees rely on the case ofPaugh v. Hanks (1983), 6 Ohio St.3d 72, 451 N.E.2d 759, to support their argument. However, Paugh does not resolve, or even address, the issues Appellees were faced with in proving proximate cause in this case.
 {¶ 29} In Paugh, the plaintiff lived near a highway exit ramp and had witnessed a number of cars drive into her home, causing physical damage to her property but not causing any physical harm to her or her children. The plaintiff sued the motorists for negligent infliction of emotional distress. The Supreme Court made a number of important holdings in this case relating to the manner in which a bystander to an accident can prove negligent infliction of emotional distress with or without resulting physical injury. Paugh held that the plaintiff must prove that the emotional distress was severe, debilitating, and reasonably foreseeable. Id. at paragraph three of the syllabus.Paugh also held that the trial court had the authority to decide from the outset whether the alleged emotional distress alleged was "serious" as a matter of law. Id. at 78.
 {¶ 30} In what appears to be dicta, Paugh made some observations about how a plaintiff could go about proving severe emotional distress:
 {¶ 31} "We also observe that with respect to questions of proof, expert medical testimony can assist the judicial process in determining whether the emotional injury is indeed, serious. However, lay witnesses who were acquainted with the plaintiff, may testify as to any marked changes in the emotional or habitual makeup that they discern in the plaintiff after the accident has occurred. The jurors themselves, can refer to their own experiences in order to determine whether, and to what extent, the defendant's conduct caused the serious emotion distress." (Citations and footnotes omitted.) Id. at 80.
 {¶ 32} Paugh does allow for the possibility of lay witness testimony being used to prove the existence and seriousness of emotional distress. Appellees, though, were required to prove more than the existence of Mrs. Antonoff's physical and psychological injuries. Appellees needed to prove the causal connection between the accident and extent of Mrs. Antonoff's injuries in light of a multitude of preexisting conditions, including her longstanding battle with depression, back problems, arthritis, and other injuries related to a prior automobile accident. Appellees also needed to prove causation with respect to a knee problem that did not manifest itself until years after the accident. In most cases, a party must provide an expert witness to establish causation when there are preexisting conditions involved or when the injury is latent and only manifests itself long after the initial trauma. Hayes v.Heintz, 8th Dist. No. 79335, 2002-Ohio-2608; Rogers v.Armstrong (March 15, 2002), 1st Dist. No. C-010287.
 {¶ 33} The longstanding rule in Ohio concerning expert witnesses was expressed in the case of Darnell v. Eastman
(1970), 23 Ohio St.2d 13, 17, 261 N.E.2d 114:
 {¶ 34} "Except as to questions of cause and effect which are so apparent as to be matters of common knowledge, the issue of causal connection between an injury and a specific subsequent physical disability involves a scientific inquiry and must be established by the opinion of medical witnesses competent to express such opinion."
 {¶ 35} Experts are almost always required to prove the causal connection between an accident and the extent of the injuries in a rear-end collision case. See Mahaffey v. Stenzel (Jan. 25, 1999), 4th Dist. No. 97CA2391; Langford v. Dean (Sept. 30, 1999), 8th Dist. No. 74854; Dolly v. Daugherty (Nov. 15, 1979), 8th Dist. No. 40021; Murray v. Doney (Feb. 1, 2002), 6th Dist. No. L-01-1365.
 {¶ 36} Appellees did not provide any pertinent expert testimony to establish the causal link between the accident and the complex list of Mrs. Antonoff's alleged injuries, including a multitude of preexisting and latent conditions. Without expert testimony, the jury should not have been permitted to arrive at a damages amount.
 {¶ 37} There are other gaps in Appellees' evidence apart from the lack of expert evidence. Appellees' counsel did not submit one single medical bill into evidence at trial in order to establish the value of the alleged damages. There were no photos or other documentation of any of the immediate injuries that Mrs. Antonoff may have sustained at the time of the accident. Mrs. Antonoff testified that she had pictures at one time, but that she got rid of them, as is revealed by the following testimony:
 {¶ 38} "Q [Counsel for Mrs. Antonoff] * * * Did you seek any medical treatment?
 {¶ 39} "A Yeah. I — I went to the doctor.
 {¶ 40} "Q Doctor who?
 {¶ 41} "A Fogarty was my doctor at the time. He's not in practice anymore. And he just said, you know, you got banged up good here, and, you know, you — you know, giving me — what do you call those, things to relax your muscles and not really able to pinpoint anything right then seriously wrong. I had bruises. I had pictures. But in one of my very weak and disgusted moments, I just tore them up and threw them away." (Tr., p. 141.)
 {¶ 42} There was also a complete failure to provide any records from Dr. Fogarty about Mrs. Antonoff's initial treatment after the accident. Appellees merely established that Dr. Fogarty was no longer in practice and was not available to testify. Dr. Cubbison also testified that he did not review any records from Dr. Fogarty. (Tr., p. 220.)
 {¶ 43} Appellees' counsel was thus left with the prospect of proving its entire case from the testimony of Mr. and Mrs. Antonoff. Remarkably, Mrs. Antonoff did not testify in person, but rather, was permitted to enter her testimony through a prerecorded deposition. Her videotaped testimony included a number of general comments about bruises, about being shaken up, and about being rattled and dazed. (Tr., pp. 127, 128, 130, 133.) She testified that "everything hurt, in a way" and "my head was like just killing me." (Tr., p. 133.) She stated that she had "two very, if not three, very miserable nights of pain." (Tr., p. 135.) Coupled with this testimony, though, was extensive testimony about Mrs. Antonoff's ongoing depression. Mr. Antonoff's loss of consortium claim appears to be based almost entirely on the debilitating effects of Mrs. Antonoff's depression. Mrs. Antonoff testified that her depression destroyed her desire to get out of bed, to spend time with her grandchildren, to go out of the house, or to perform many of the basic functions of life. (Tr., pp. 148-151.) Mrs. Antonoff testified:
 {¶ 44} "Well, the depression is just hell, period, to put up with. But to have this feeling of not wanting to do anything and not feeling good, wasn't able to pick up my grandkids anymore at all, no more dancing, no more shoes with, you know, nice high heels or anything like that." (Tr., p. 149.)
 {¶ 45} It is clear from the record that Mrs. Antonoff's depression existed long before the 1993 accident, and was actually started by an earlier accident in 1987. (Tr., pp. 140, 168.) Mrs. Antonoff sustained many other injuries from this prior accident, including severe back injuries, which continued to affect her at the time of the 1993 accident. (Tr., p. 139.)
 {¶ 46} Appellees tried to isolate Mrs. Antonoff's knee injury as an injury that did not predate the 1993 accident. Mrs. Antonoff's own testimony, though, undercut the possibility that her knee problems were caused by the 1993 accident. Mrs. Antonoff herself established that lack of a causal link:
 {¶ 47} "Q [Counsel for Mrs. Antonoff] * * * If you can recall, did anyone tell you, any medical professionals, Dr. Fogarty, a physical therapist, anyone like that, that your knee was hurt because of the accident?
 {¶ 48} "A No, I can't say that they actually came out and said that." (Tr., p. 147.)
 {¶ 49} The jury in this case was required to determine not just that Mrs. Antonoff had injuries, but rather, the extent, if any, to which those injuries were caused by the accident. Given the many complicating factors in this case, it was not sufficient for Appellees to rely solely on lay testimony, and we should sustain Appellant's two assignments of error.
 {¶ 50} Even if we assume, though, that the lay testimony of Mr. and Mrs. Antonoff was sufficient to establish that some type of injury occurred at the time of accident, I believe we still must sustain Appellant's assignments of error. The majority contends that Appellees' lay testimony proved that Mrs. Antonoff sustained some general injury and soreness at the time of the 1993 accident, and that this soreness did not require proof established by an expert witness. The majority goes on to explain that there were no jury interrogatories in this case, so that it is impossible to tell from the record which portion of the damages award related to this initial soreness, and which portion related to much more complicated injuries that should have been proven by expert testimony. The majority asserts that Appellant never raised the issue of the amount of damages as the reason for asserting the motion for directed verdict or JNOV, and therefore, cannot challenge the reasonableness of the damages award since there are at least some minimal injuries that are established in the record and that can be compensated.
 {¶ 51} I disagree with this conclusion. The only issue at trial was the extent of the damages under the underinsured motorists provision of the automobile insurance policy. If there is only one issue at trial, and there is certainly no dispute between the parties that there was only one issue at trial, then Appellant could hardly have been challenging anything other than the reasonable damages amount when counsel challenged the verdict. The fact that Appellant's counsel did not expressly state what is clearly apparent from the sole subject matter of the trial itself should not prevent us from fairly reviewing the reasonableness of the jury award.
 {¶ 52} Based on the instructions given by the trial judge, the jury was only authorized to award damages if it found that the damages amounted to more than the $12,000 that Appellees had already been given in the prior settlement with the tortfeasor. In other words, the jury had to determine the reasonable extent of damages, subtract $12,000 from that amount, and record the lesser value as the amount of its verdict. Based on the jury instructions, the jury actually determined that the reasonable damages in this case amounted $24,500, consisting of the original $12,000 settlement, an additional amount to Mrs. Antonoff of $2,500, and a $10,000 award to Mr. Antonoff for loss of consortium. I find that the lay testimony of Mr. and Mrs. Antonoff, even if admissible to prove the extent of the injuries in this case, was insufficient to support the jury award, particularly since the jury took into account the $12,000 settlement already received by Appellees. I would reverse the trial court judgment and enter judgment for Appellant.